IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

JOEL SCOTT FLAKES,

                Plaintiff,                      OPINION AND ORDER

    v.

                                              17-cv-237-wmc

DOC SECRETARY KEVIN CARR,
HOLLY KITCHELL and
EDWARD WALL,

                Defendants.

       *Pro se* plaintiff Joel Scott Flakes, an inmate at Stanley Correctional Institution ("Stanley"), is proceeding on claims under 42 U.S.C. § 1983, and the Rehabilitation Act, all related to defendants' alleged failure to grant his request for "a personal care attendant." Generally, Flakes claims that the Wisconsin Department of Corrections ("DOC") only provides respite workers to assist in transport to specific appointments, which leaves wheelchair-dependent prisoners like him on their own to find assistance to travel to otherwise available "services, programs and activities." In particular, Flakes claims that Stanley's former ADA Coordinator Holly Kitchell denied his request for his own personal assistant in 2015 out of personal animus. Based on these allegations, the court also granted Flakes leave to proceed on a Rehabilitation Act claim against Wisconsin Department of Corrections ("DOC") Secretary Kevin Carr and on a Fourteenth Amendment claim against Kitchell and former DOC Secretary Edward Wall.

      Defendants Kitchell and Carr are both represented by the Wisconsin Department of Justice, while defendant Wall is represented separately. However, all three defendants seek summary judgment. (Dkt. ##37, 46.) Since no reasonable fact-finder could conclude

1

that defendants Kitchell or Wall violated plaintiff Flakes' Fourteenth Amendment rights by denying his 2015 request for a personal care attendant, and Flakes submitted no evidence suggesting that he has been denied other services, programs or activities because of his disability, all defendants are entitled to summary judgment. Therefore, the court must grant defendants' motions and enter judgment in their favor.

UNDISPUTED FACTS[1]

**A. Background**

Flakes has been housed at Stanley since January 16, 2003. Defendant Kitchell was assigned as Stanley's ADA Coordinator from about May 2015 to May 2016. Defendant Kevin Carr is the DOC's current Secretary, and defendant Edward Wall previously served as the DOC's Secretary.

Between May 2014 and November 2015, the DOC had an employment position known as "Respite worker." Respite workers were expected to perform all tasks relating to helping any offender with a handicap or medical needs, and all care necessary to meet their daily living needs. Although subject to change, these workers have the following, specific responsibilities:

- Assist inmates with meals, shower preparation, cell cleaning and any other daily living activities.
- Transport inmates in wheelchairs to appointments, visits or other areas as needed.
- Check in with inmates throughout the day to see if anything is needed.

---

[1] Unless otherwise noted, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as the underlying evidence cited, as appropriate.

- Report to staff any medical concerns or issues with the assigned inmate.

In November 2015, the respite worker position was replaced with a more specialized position called "Respite Care - Specialized," which still exists. There is at least one respite worker for each wing of unit 2 at Stanley. Respite workers are not assigned to take care of specific inmates; rather, the respite workers may be asked to assist any of the inmates on any wing in unit 2.

In October 2017, the DOC also added a new position within the Health Services Unit ("HSU") called "Inmate Special Needs Worker." This position requires training, and the workers assist inmates who are unable to complete certain tasks independently, such as maintaining and cleaning their cell or ensuring timely attendance at meals, appointments and activities.

Under Division of Adult Institutions Policy and Procedure #300.00.35, a reasonable accommodation includes, but is not limited to: adjustments, adaptions or modifications to facilities or operations within a facility, or the use of modified or auxiliary aids that enable a qualified person with a disability equal access, participation, and benefits of programs, services and activities. Inmates seeking an accommodation are to complete a DOC-2530 Reasonable Modification/Accommodation Request form. Upon receipt, the ADA Coordinator acknowledges receipt of any DOC-2530 and provides the inmate a copy of the form. HSU and/or psychological services unit staff and the ADA Coordinator then obtain and review the relevant medical and mental health history to determine the extent and origin of the disability and the need for accommodations.

As Stanley's ADA Coordinator, defendant Kitchell attests that her practice was to meet with the special needs committee at Stanley to review requests for accommodations that required HSU input. The special needs committee determines whether an inmate requires a medical/dental restriction or special need, based on medical or dental necessity, and makes recommendations. The committee typically includes a representative from HSU, PSU, a non-security staff representative (such as a unit manager), and a security staff member.

**B. Flakes' Medical History**

Since as early as 1992, Flakes has been diagnosed with osteoarthritis of his bilateral hips. As a result, he has been confined to a wheelchair since 1999. Flakes can wheel himself in a wheelchair on flat surfaces, including inside buildings. Although Flakes has difficulty standing and walking, he is able to move around his cell by using his bed, desk, TV stand, wheelchair, and other items available to hold and steady himself.

In 2005, Flakes was seen by orthopedics. Because surgery was not recommended, Flakes was advised to continue walking and perform range of motion exercises. Flakes has declined multiple recommendations to engage in physical therapy; instead, he generally stays in his wheelchair. Dr. Joan Hannula has treated Flakes since approximately 2008. In 2010, Flakes was reevaluated for hip surgery but deemed an exceptionally high risk.

Dr. Hannula's perception of Flakes is that he is independent and does not like anyone assisting him with tasks he feels capable of completing on his own. Specifically, Dr. Hannula has opined that Flakes can propel himself in his wheelchair using his arms

and legs, and she has observed him use his feet to push off walls when he needs to turn himself around. Dr. Hannula adds that since she began treating Flakes, he has been able to accomplish his activities of daily living on his own, including dressing himself and getting to meals and the restroom; he is able to stand and take small steps while holding furniture; and he is able to stand and get down on his knees to use his locker (which is at floor level), as well as stand back up without assistance. Even so, Dr. Hannula states that if Flakes is traveling a long distance outside his unit, he requires someone to push him in his wheelchair, and that Stanley has respite workers available to help him. Dr. Hannula adds that Flakes has never expressed to her that he wishes to attend religious services, recreational facilities or events, or use other resources at Stanley, but cannot because he uses a wheelchair.

In September 2020, Flakes was approved for bilateral hip replacement. In June of 2020, Flakes started participating in physical therapy and increased his range of motion and hip strength, as well as his ability to use a walker. Unfortunately, in September 2020, Flakes declined the opportunity for hip surgery out of concerns related to the COVID-19 pandemic. Even now, however, Flakes has been told to reach out to HSU if he changes his mind and wishes to proceed with surgery.

### C. Flakes' Housing at Stanley

In 2015, Flakes lived in Unit 1 at Stanley, where non-defendant Paula Stoudt worked as the unit manager. The B and C wings of Unit 1 at Stanley houses inmates with mental health or other special needs. Stoudt explains that as unit manager, her

responsibilities include "pair[ing] with care," meaning that she had to pair inmates up to avoid risks to the inmates, the unit and the institution. This was particularly true with respect to Unit 1, where inmates were more vulnerable and susceptible to manipulation.

Based on Stoudt's observations, she believed that Flakes' choices of cellmates were "predatory" in nature. For example, Flakes had a younger cellmate in 2014, and Stoudt was concerned about it after noticing at some point that the back of the cell was covered, making it completely dark. Uncomfortable with that arrangement, Stoudt reassigned the younger cellmate, which made Flakes very upset with her. Subsequently, Flakes submitted an inmate complaint about his cellmate assignments, claiming that Stoudt and others had caused him "undue conflict" by not granting his cellmate requests. (Ex. 1005 (dkt. #42-1).) In December 2014, Warden Richardson issued Flakes a memorandum, copying Stoudt, and responding that per the inmate handbook, "room or bed changes are based on medical, clinical, or security, not inmate requests." (*Id.*) Since Flakes had alleged that he was being discriminated against, Warden Richardson also asked Flakes to detail what he believed to be discriminatory, while advising to work with his unit manager and to put his best effort into getting along with his cellmates.

Flakes has lived on Unit 2 since the summer of 2017. Non-defendant Heather Wilhelm-Copas has been Unit 2's unit manager since January 2019. Housing Unit 2's lower tier is wheelchair accessible, with each tier comprising approximately 25 cells and about 50 inmates, and each wing on Unit 2 locked down daily between 9:15 p.m. and 6:00 a.m., during which time inmates must stay in their cells. Besides Flakes, there is only one other inmate on Unit 2 who requires a wheelchair for transport off unit, and inmates on

Unit 2 are required to clean their own cells, which includes sweeping; mopping if necessary; emptying the wastebasket; hanging or folding and putting away clothes and towels; dusting; cleaning fixtures, including the toilet, sink, mirror, lights and hooks; making beds; cleaning the door, window and walls, if needed; and shaking out rugs. Necessary cleaning supplies and available and provided to inmates.

While on Unit 2, Flakes has had some inmates who have assisted him with some of these tasks, and others who will not. Flakes is able to make his bed and clean his cell, so long as he has someone to wring out the mop for him. Unit 2 Manager Wilhelm-Copas has not received complaints that Flakes' cell is not clean, and Flakes has never been disciplined or threatened with discipline for not cleaning his cell.

For most of his time at Stanley, Flakes continued to have cellmates, but he has not had a cellmate since December 21, 2020, due to a lower inmate population since the COVID-19 pandemic began. Flakes' current cell is also located at the opposite end of the wing from the showers. Although Wilhelm-Copas offered to move Flakes to a larger cell that is right next to the showers, and bigger for wheelchair use, Flakes declined, responding that it was easier for him to move around the smaller cell, using objects to balance himself while standing. That said, Wilhelm-Copas attests that if Flakes so requests, staff could install grab bars in the larger cell for Flakes. Indeed, grab bars have been installed for other inmates.

Wilhelm-Copas attests that she makes cell assignments for all wings of Unit 2. Inmates may submit cellmate requests to her quarterly, which she reviews, but like Stoudt,

Wilhelm-Copas also assesses the risks associated with housing inmates together to ensure inmate, unit and institutional security.[2]

Wilhelm-Copas also recalls an occasion in which Flakes refused help. A correctional sergeant on Unit 2 offered to carry Flakes' beverages and meal tray, but Flakes refused and got defensive. In fact, Wilhelm-Copas attests that Flakes refuses to let *anyone* help him with his meal trays. Nevertheless, Flakes claims that the only way he gets his food tray is from a respite worker wearing plastic gloves and hairnet, and he only declined help from a *correctional officer* because of concerns about COVID-19.

Finally, Flakes has several options available to him for recreation. He may attend outdoor recreation and have a respite worker push him around the track or use the equipment for upper body strength; he may attend indoor recreation and use upper body strength equipment, participate in activities such as badminton, handball, pickleball, basketball, horseshoes; or he could play an instrument in the silent music room. Currently, all recreation activities are open, but there are limits due to COVID-19, and outdoor recreation is seasonal. Flakes has not asked anyone to push him to a recreation area or activities since 2015, yet he claims that his recreation experience is different from other inmates given his confinement to a wheelchair and because his wheelchair can only access a small area outside his unit.

---

[2] Flakes claims that while other inmates have been allowed to choose their inmates, he has been denied that privilege by Wilhelm-Copas. (PPFOF (dkt. #53) ¶ 9.) Flakes further claims that in December 2020, he was placed with an inmate who threw his wheelchair and had to be moved, and then he was placed with another inmate who threatened him. (*Id.*) Since Flakes is not proceeding on any claims against Wilhelm-Copas related to her decisions about cellmate placement, and even assuming she made these decisions, they do not relate to Flakes' 2015 request for a personal care attendant, these factual findings appear to have no relevance.

### D. Flakes' use of respite workers and 2015 request for accommodation

During all relevant times, Flakes has been aware of how to request help from a respite worker, and he is also aware who in his unit is a respite worker. He further knows to reach out to correctional officers if he is unable to locate a respite worker on his own. Although he testified that the recreational area was denied to him sometime in 2015, Flakes was also unable to recall during his deposition any specific instance, nor a respite worker who refused to take him to the recreation area. Flakes further testified that at some point before he filed his request for accommodation in 2015, respite workers told him to have his cellmate clean his cell for him.

Apparently after having these issues with respite workers, Flakes went to Unit Manager Stoudt to ask for a cellmate who could perform the duties of a personal care attendant, suggesting an inmate with the last name Webb to be his cellmate and personal care attendant. Apparently, Flakes and Webb were friends and played chest every day, and Flakes testified at his deposition that Webb was aware of his "situation and he was willing to assist and he would have been getting paid." (Flakes Dep. (dkt. #36) 43:22-44:19.) While Webb further agreed to take the position, Stoudt denied Flakes' request since that type of inmate worker did not exist. Moreover, Stoudt could not approve his request, since she lacked the authority to create such a position.

Instead, Stoudt instructed Flakes to go through the ADA accommodation request process, but Flakes believes Stoudt actually denied his request because Stanley officials were angry at him for filing a lawsuit while he was incarcerated at Oshkosh Correctional Institution in 2002.

On August 12, 2015, Flakes submitted a DOC-2530, requesting a personal care attendant with the following conditions:

- The attendant would live with Flakes in his cell.

- The attendant would receive compensation of at least a 3 rating.

- The attendant would be of Flakes' choosing.

- The attendant would agree to perform the following duties: make his bed, keep the cell clean and neat, and push Flakes in his wheelchair back and forth to appointments, and to all other off-unit activities, such as to the library, religious services and recreation.

However, there was no "personal care attendant" position at Stanley at that time. Instead, Flakes "created" that position as part of his request, envisioning the person as a companion who would know Flakes' schedule, and Flakes would know his schedule. Flakes testified that he wanted the attendant to be paid at the 3 rating to incentivize people to take the position.

As ADA Coordinator, Kitchell claims she reviewed Flakes' request closely, noting all of the conditions of his request. On or around August 17, 2015, Kitchell also met with the special needs committee and presented Flakes' request for accommodation. Kitchell does not recall who specifically was present at the meeting, but she attests that it would have included one HSU representative and a unit manager. Stoudt was present to provide input on inmates housed in Unit 1.

The committee noted that Flakes' request was unique because he wanted to pick the inmate and requested a specific wage. During the discussion, the representatives

compared Flakes' vision for the personal care attendant to the duties of a respite worker, and Stoudt advised that each housing unit had four to six respite workers available to inmates as needed. Kitchell and Stoudt further recall discussing Flakes' physical abilities, including that Flakes had a lower bunk, could make his bed, and could access respite workers for help with daily activities, including those listed. Stoudt also could not recall Flakes ever complaining to her that any respite worker refused to help him with any task, nor that respite workers were even unavailable to help him. Accordingly, the committee recommended that Kitchell deny Flakes' request, finding that he did not require full-time services from another inmate and had proper access to use respite workers for tasks as required.

Kitchell also attests that the *only* conditions from Flakes' request *not* met by respite workers were that they would not be living with Flakes and were not paid at the rate Flakes requested. Yet no inmate is allowed to select their own cellmates. Instead, while they may submit a *request* for a certain cellmate with the unit manager, staff does not automatically grant such requests, but must ensure that the pairing does not create a risk to institution or inmate safety or security. Likewise, inmates cannot choose the pay rate for an inmate assisting him, since that authority would create an inappropriate power dynamic.

On August 31, 2015, Kitchell also met with Flakes. During their meeting, Flakes did not tell Kitchell that the respite workers were not doing their jobs, nor did Flakes complain about his unit manager at the time, Stoudt. In fact, Kitchell attests that she never received *any* complaints about Stoudt or respite workers not doing their jobs.

After receiving the committee's recommendation and meeting with Flakes, Kitchell decided to deny Flakes DOC-2530 request. Specifically, Kitchell agreed it would be unreasonable to permit Flakes to choose his own cellmate or determine how much his personal care attendant would be paid, and that Flakes' other desired requests could be met by using existing respite workers. On September 1, 2015, therefore, Kitchell denied Flakes' request, explaining that "the existing offender position description for a respite worker includes all items being requested." (Ex. 1002 (dkt. #40-3) 1.)

After the denial, Flakes filed inmate complaint SCI-2015-18315, alleging that there was a lack of programming, services and activities offered to him and other qualified disabled individuals at Stanley, and again requesting his own personal care attendant. The institution complaint examiner ("ICE") contacted Kitchell about the inmate complaint, and Kitchell explained that she denied the request because respite workers could help him with cleaning and push him to his appointments or any programs, services, visits and other areas as needed. The ICE similarly contacted Stoudt and asked her if she received complaints from staff or inmates about the condition of Flakes' cell. Stoudt reported that she had not. Finally, the ICE asked Dr. Hannula to review Flakes' request for accommodation, who reported back that Flakes was capable of accomplishing his daily living activities on his own, but might require someone to push his wheelchair to areas outside of his unit. Dr. Hannula further opined that it was now medically necessary for someone to live with Flakes because of his disability, and agreed existing respite workers could accommodate the other items detailed in his request.

### E. Flakes' subsequent use of respite workers

Flakes did not follow up with Kitchell after her denial, although she heard from other Stanley staff that Flakes was angry about it. Moreover, this was the only DOC-2530 request that Kitchell reviewed from Flakes while she was the ADA Coordinator. In fact, Kitchell had no other experience with Flakes before he submitted this request and was unaware of any other lawsuits or complaints that Flakes may have filed about her or the DOC.

Stanley's current ADA Coordinator Brandon Drost also reviewed the DOC-2530 forms on file with the ADA Coordinator's office, and he did not locate any requests from Flakes since that 2015 request. Similarly, since Wilhelm-Copas became Flakes' unit manager in 2017, she is not aware of his submitting any other requests for a reasonable accommodation. Neither is there a record of Flakes submitting a DOC-2530 request for assistance beyond what respite workers provide, nor has Flakes reported that respite workers are not doing their jobs.

Since his 2015 request for accommodation, Flakes has also not sought help from respite workers in cleaning his cell or getting to activities and places outside his unit, nor has he complained that respite workers are not doing their jobs or giving the assistance he needs. While Flakes has identified Islam as his religion, he further admits that he had stopped attending religious services for reasons unrelated to this lawsuit and could not recall the last time he asked to attend religious services. Finally, Flakes is not enrolled in school, and he has been able to attend the law library, with the help of a respite worker.

Nevertheless, Flakes contends that he has complained "many many times" about not be able to participate in all services, programs or activities provided to non-disabled inmates, and he was told by Unit 1 Manager Stoudt that he was a nuisance, which has disciplinary consequences. At the same time, Flakes acknowledges *never* complaining to Wilhelm-Copas specifically about the availability of respite workers since moving to Unit 2. So, too, Flakes admitted at his deposition that he has not asked for help or complained because he did not want to be considered a nuisance and believed any request would be futile, and that he got "fed up" asking for assistance getting to activities outside of his unit. (Flakes Dep. (dkt. #36) 71:24-73:15.)

Even so, for purposes of this record, Flakes appears to dispute the availability of respite workers or "yellow hats" (inmate workers available for assistance), representing that if either were "available or agreeable," this lawsuit would not exist. (Pl. Opp'n Br. (dkt. #52) ¶ 10.) Instead, without providing examples, Flakes claims that he has had to trade or purchase items from the canteen to get respite workers to do their job.

In 2017, Flakes did ask Stanley's HSU for information about the new Inmate Special Needs Worker position, asking first, "If I were to request a special needs worker would I be allowed to choose the special needs worker," and "second will that special needs worker be allowed to live with me, otherwise a special needs worker is in name only." (Ex. 1006 (dkt. #43-1) 9.) During his deposition, however, Flakes could not recall whether he actually discussed with his unit manager getting an inmate special needs worker assigned to him. (Flakes Dep. (dkt. #36) 82:4-15.) Moreover, the record appears that Flakes was *offered* an inmate special needs worker in November of 2017. Specifically, a November 20,

14

2017, note in Flakes' medical records reads: "Refused offer of inmate special needs worker as he states he is currently in litigation suing DOC over the issue." (Ex. 1006 (dkt. #43-1) 10-11.) By way of explanation, Flakes claims that on November 20, he was forced to go to the HSU at about 8:00 p.m., and a nurse asked him if he wanted to participate in a new worker program, which Flakes took to be an indication that "defendant prison authorities were making moves to try to defeat my lawsuit." (Pl. Opp'n Br. (dkt. #52) ¶ 17.)

## OPINION

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party" to survive summary judgment. *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406–07 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)) (brackets omitted). During summary judgment, disputed facts are viewed in a light most favorable to the plaintiff as the non-moving party; however, this treatment does not extend to inferences supported merely by speculation or conjecture. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017); *Coleman v. City of Peoria, Ill.*, 925 F.3d 336, 345 (7th Cir. 2019).

## I.     Rehabilitation Act

As an initial matter, a prison's failure to accommodate a disability can constitute a

denial of programs or services. *Lacy v. Cook Cty., Illinois*, 897 F.3d 847, 853 (7th Cir. 2018) (citations omitted). However, whether an accommodation is reasonable is a fact-intensive inquiry that "must be judged in light of the overall institutional requirements." *Love v. Westville Corr.*, 103 F.3d 558, 561 (7th Cir. 1996). "Security concerns, safety concerns and administrative exigencies [are] important considerations to take into account." *Id."* "The key question is whether [the inmate] was able to participate in the activities in question, given his disability, with or without reasonable accommodations from the prison." *Id.* at 560. To succeed on his claim of discrimination in violation of § 504 of the Rehabilitation Act against the current DOC Secretary in particular, plaintiff must prove he is: (1) an individual with a disability; (2) who was otherwise qualified to participate; (3) but who was denied access solely by reason of disability; (4) in a program or activity receiving federal financial assistance. *See Jaros v. Illinois Dep't of Corr.*, 684 F.3d 667, 671-72 (7th Cir. 2012).

In seeking summary judgment, defendant Carr argues that Flakes' 2015 accommodation request was unreasonable on its face, and in any event, the denial of his request did not preclude plaintiff from accessing any program or activity. Plaintiff argues in opposition that his request was reasonable, and the accommodations available to him do not give him access to the same programs and resources as inmates without wheelchairs. Since the evidence of record does not support a finding that respite workers were actually unavailable to assist plaintiff to attend programming and activities, and there are proper security-based reasons to deny plaintiff's unique request for his own, so-called "personal care attendant," Carr is entitled to summary judgment.

As to the reasonableness of plaintiff's request, as Carr points out, it is essentially undisputed plaintiff's disability does *not* require full time assistance. Indeed, plaintiff's request that his personal care attendant be his cellmate did not reference a need to have 24-hour assistance: instead, he wanted an attendant to make his bed, clean his cell and push him to appointments and activities. However, these are all tasks that existing respite workers are specifically assigned to perform for plaintiff, if needed, *and* the evidence of record suggests that plaintiff is able to accomplish these tasks on his own anyway. Indeed, plaintiff does not dispute Dr. Hannula's observations *as his treating physician* that Flakes can and does perform these daily living functions on his own, nor that he refused Unit 2 Manager Wilhelm-Copas's offer of a larger cell in 2020 because he preferred a smaller cell so that he could be more independent. Finally, there is no evidence suggesting that plaintiff's cell was ever observed to be messy or untidy, and he has never even been threatened with discipline, much less disciplined, for failing to keep his cell clean or make his bed.

Carr also points out the obvious security and safety concerns that would arise in fulfilling plaintiff's request to choose his own cellmate and set his pay rate. No evidence calls into question the validity of these concerns. To the contrary, a security staff member specifically voiced the concern about plaintiff ability not only to choose the personal care attendant but also set his pay rate in 2015, and Unit 1 Manager Stoudt had a specific concern at the time that plaintiff had predatory tendencies and should not be able to choose his own cellmate. Plaintiff fails to address these legitimate security and safety concerns, preferring to focus instead on the supposed reasonableness of his personal care

attendant proposal because the pay rate he requested was lower than the pay rate for the Inmate Special Needs Worker. However, plaintiff's accommodation request was not denied because it would cost too much; it was denied because of obvious security-related concerns *and* Kitchell's reasonable judgment that plaintiff's legitimate needs were already being met by respite workers.

In any event, plaintiff has not come forward with evidence permitting a reasonable inference that the accommodations he already receives at Stanley have prevented him from participating in Stanley's activities and programs. To the contrary, there is *no* evidence that plaintiff lost the opportunity to participate in any religious activities, law library time or school either because respite workers were unavailable or because he does not have a personal care attendant. Further, plaintiff has not renewed an accommodation request since 2015, and in fact, he *rejected* additional help in 2017, declining the help of an Inmate Special Needs Worker, either because he was able to perform tasks on his own or with the help of respite workers. Finally, rather than detailing instances in which he has actually missed specific programs or activities, plaintiff purports to disagree with the *quality* of the accommodations he may access, and even then he wholly fails to link his dissatisfaction to poorly performing respite workers or lack of access to a so-called personal care attendant. Similarly, although plaintiff is understandably unhappy that his confinement to a wheelchair limits the activities in which he can participate during recreation, he has failed to submit evidence detailing instances in which he was not able to attend recreation or participate in other desired programming *because* he did not have a personal care attendant.

The balance of plaintiff's arguments in opposition to the motion for summary judgment merely convey his generalized disagreement with Kitchell's denial of his 2015 request, and conclusory assertions that he has been unable to access respite workers. However, his frustration with the 2015 denial falls far short of creating a legitimate factual dispute as to whether his current accommodation do not meet his needs, much less that his proposed accommodation would actually meet those needs. Indeed, there is no reasonable basis to conclude that plaintiff has actually suffered a deprivation that would entitle him to relief under the Rehabilitation Act when faced with defendant Carr's evidence showing since 2015, that plaintiff has not once: (1) requested any reasonable accommodations, (2) informed his unit managers or Stanley staff that he has been unable to participate in activities, programming, or perform daily living functions because of lack of access to respite workers or other assistive inmates or staff; or (3) actually missed any programming, activities or daily living tasks. Accordingly, the court will grant summary judgment in Carr's favor on this claim.

III. **Equal protection**

As for plaintiff's remaining equal protection claim against defendants Wall and Kitchell, the court will address the claim against each defendant separately.

A. **Defendant Wall**

Defendant Wall also moves for summary judgment on plaintiff's ADA claim, maintaining that he was not personally involved in the events related to his requests for accommodations. To be held liable under § 1983, a plaintiff must prove each defendant's

personal participation or direct responsibility for the constitutional deprivation. *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (citing *Wilson v. Warren Cty.*, 830 F.3d 464, 469 (7th Cir. 2016). More specifically, "[s]ection 1983 does not establish a system of vicarious responsibility. Liability depends on each defendant's knowledge and actions, not on the knowledge or actions of persons they supervise." *Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (citation omitted). Therefore, "for a supervisor to be liable, they must be 'personally responsible for the deprivation of the constitutional right.'" *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001)). To establish personal involvement, the supervisor must "'know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see.'" *Id.* (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992-93 (7th Cir. 1988)).

Plaintiff does not dispute that Wall was uninvolved in the material events related to his personal attendant request or subsequent difficulties attending activities or accessing programming at Stanley. Moreover, there is no indication that Wall was aware of, or involved in resolving, plaintiff's inmate complaint about his denied DOC-2035.

Indeed, from October 27, 2012, to February 27, 2016, defendant Wall, as Secretary, had only general supervisory authority over DOC's operations. However, he did not supervise the day-to-day operations of individual DOC institutions while he served as Secretary. Rather, Wall deferred to DOC staff at each institution for such matters. In particular, Wall would not have been made aware if an individual like Flakes filed a complaint through the inmate complaint review system regarding health or safety concerns

or complaints regarding illness or recreation, nor would he be involved in the disposition of such complaints. Finally, Wall never met with or communicated with Flakes, nor was he personally involved in handling Flakes' health care decisions, denials or appeals. Accordingly, Wall is entitled to summary judgment because no reasonable fact-finder could conclude that he was personally responsible for the events related to plaintiff's claimed Fourteenth Amendment equal protection claim, and the court need not reach his qualified immunity argument.[3]

## B. Defendant Kitchell

Finally, defendant Kitchell seeks summary judgment on the merits of plaintiff's class of one claim. To succeed on a Fourteenth Amendment "class of one" equal protection claim in the Seventh Circuit, a plaintiff must "plead and prove that he was 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *Glover v. Dickey*, 668 Fed. Appx. 158, 160 (7th Cir. 2016) (quoting *D.B. ex rel. Kurtis B. Kopp*, 725 F.3d 681, 685-86 (7th Cir. 2013)). However, "[i]f the government official provides a rational basis for the challenged action 'that will be the end of the matter -- animus or no.'" *Id.* (quoting *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014)).

Defendants correctly point out that there is a threshold question as to whether a Fourteenth Amendment "class of one" equal protection claim is viable with respect to

---

[3] The court did not grant plaintiff leave to proceed on any official capacity claim against Wall, but for the sake of completeness, any official capacity claim against Wall is moot, since he is no longer serving as the DOC Secretary.

Kitchell's decision, given the Supreme Court's ruling in *Enquist v. Or. Dep't of Agric.*, 553 U.S. 591, 603–04 (2008), that government employees may not bring class-of-one equal protection claims based on employment decisions, since such decisions are "based on a vast array of subjective, individualized assessments." *Id.* at 603-04. This same principle has been applied by this court and the Eastern District of Wisconsin to claims involving discretionary decisions of prison officials challenged by inmates. *E.g.*, *Nigl v. Litscher*, 378 F. Supp. 3d 729, 740 n.8 (E.D. Wis. 2019) ("Class-of-one equal protection claims are very difficult, if not impossible, to prove in the context of an official's discretionary decision-making."), *aff'd*, 940 F.3d 329 (7th Cir. 2019), *cert. denied*, 140 S. Ct. 2772 (2020); *Atkinson v. Mackinnon*, No. 14-CV-736-BBC, 2015 WL 506193, at *1 (W.D. Wis. Feb. 6, 2015) (prison disciplinary decisions not subject to equal protection challenge). This argument has significant appeal here in particular, there being no question that the very nature of Kitchell's decisions as the ADA Coordinator are inherently discretionary and require consideration of a multitude of factors.

Even assuming for the sake of argument that the Seventh Circuit would recognize a class of one claim in the context of an ADA accommodation within the prison setting, Kitchell is entitled to summary judgment on the merits. Not only has plaintiff failed to submit evidence that he was treated differently than similarly situated inmates, but no evidence calls into question Kitchell's legitimate justification for denying plaintiff's request for creation of his own personal care attendant position to be chosen and compensated according to his preferences. Indeed, Kitchell's reason to deny him a personal care attendant -- a position that plaintiff *created* out of whole cloth -- was solidly grounded in

the observation that plaintiff was able to perform many functions himself, could access respite workers for tasks and transport as needed, and would improperly be allowed to choose his own cellmate and set his pay rate. No evidence of record suggests that Kitchell's observations were incorrect, much less an indication that she singled plaintiff out for mistreatment or punishment. Therefore, she, too, is entitled to summary judgment, and the court need not resolve her alternate qualified immunity argument.

ORDER

IT IS ORDERED that:

(1) Defendant Wall's motion for summary judgment (dkt. #46) is GRANTED.

(2) Defendants Kitchell's and Carr's motion for summary judgment (dkt. #37) is GRANTED.

(3) The clerk of court is directed to enter judgment in defendants' favor and close this case.

Entered this 16th day of July, 2021.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge